UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL NO. H-08-00022

PAUL GRAYSON NOVAK,

Defendant.

### STATEMENT OF THE OFFENSE

At all times relevant to the charged offense:

1. From in and around late 2003 through in and around March 2005, the defendant, PAUL GRAYSON NOVAK ("NOVAK"), willfully conspired with others to make a series of corrupt payments totaling more than $6 million to, among others, various officials of the Federal Republic of Nigeria ("Nigeria") and officials of a Nigerian political party, to assist in obtaining and retaining the Eastern Gas Gathering System project and its optional scopes of work, all in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a) and 78dd-2(i).

2. Nigeria was a sovereign African nation with substantial deposits of oil and gas within its territory, both on land and offshore in the Niger Delta region. A particular political party (referred to herein as the

"Political Party") has been the dominant political party in Nigeria from 1999 to the present.

3. The Nigerian National Petroleum Corporation ("NNPC") was a government-owned company charged with the development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry, and was the majority shareholder in certain joint ventures with various multinational oil companies. National Petroleum Investment Management Services ("NAPIMS") was a subsidiary of NNPC that, among other things, oversaw Nigeria's investments in the joint ventures and other development projects. Shell Petroleum Development Co. of Nigeria, Ltd. ("SPDC") was the operator of a joint venture among NNPC (55%), SPDC (30%), and two foreign oil companies (the "Joint Venture").

4. Willbros Group, Inc. ("WGI") was a corporation organized under the laws of the Republic of Panama in 1975 (WGI's predecessor companies date back to 1908), and had its principal place of business in Tulsa, Oklahoma (until 2000) and then in Houston, Texas (from 2000 to the present). WGI provided construction, engineering and other services in the oil and gas industry, and conducted international operations through a wholly-owned subsidiary, Willbros International, Inc. ("WII"), a Panamanian corporation which also maintained its principal place of

business in Tulsa, Oklahoma (until 2000) and in Houston, Texas (from 2000 to the present). The shares of WGI, a public company since 1996, were traded on the New York Stock Exchange under the symbol "WG."

5. Until the sale of its assets in Nigeria in early 2007, WGI had conducted business in Nigeria for more than forty years. Three WII subsidiaries conducted the majority of WGI's Nigerian business: Willbros West Africa, Inc. ("WWA"), Willbros Nigeria Ltd. ("WNL"), and Willbros Offshore Nigeria Ltd. ("WONL") (collectively referred to herein as the "Willbros Nigerian Subsidiaries").

6. The Willbros Nigerian Subsidiaries performed work on certain Joint Venture and other Nigerian oil and gas projects from the 1990s through 2005. Among the many projects in which one or more of the Willbros Nigerian Subsidiaries participated was the Eastern Gas Gathering System ("EGGS") project, a natural gas pipeline system in the Niger Delta designed to relieve existing pipeline capacity constraints. On certain Nigerian projects, including EGGS, one or more of the Willbros Nigerian Subsidiaries partnered with a German construction company ("GCCB"), a subsidiary or affiliate of a multinational construction services company based in Mannheim, Germany.

7. The EGGS project, which was divided into two phases, consisted of the construction of a major natural gas pipeline system through remote, swampy and otherwise difficult terrain in the Niger Delta. EGGS Phase 1 involved engineering, procurement and construction (known as "EPC") of a pipeline from the Soku Gas Plant to the Bonny Island Liquefied Natural Gas Plant. EGGS Phase 1 included an optional scope of work (known as "EGGS Coating") for the application of a Polyethylene-concrete coating to the EGGS Phase 1 pipeline to give it sufficient weight and protection. EGGS Phase 2 was another optional scope of work within the EGGS Phase 1 proposal, and contemplated the construction of a second pipeline from an area known as the "Gbaran/Ubie node" to the Soku Gas Plant.

***Relevant Employees, Officers and Agents of WGI and WII***

8. NOVAK was a United States citizen who represented two consulting companies, Company S and Company F, operating in Nigeria. Companies S and F entered into contracts with WWA that purportedly involved legitimate consulting services, but in truth Companies S and F acted as conduits for corrupt payments to foreign officials in Nigeria authorized by co-defendant James K. Tillery and others. NOVAK was an

agent of WGI and WII under the FCPA, 15 U.S.C. §§ 78dd-1(a) and 78dd-2(a).

9. Co-conspirator James K. Tillery ("Tillery") was a United States citizen and an employee of WII from the 1980's through in or about March 2002. From in or about April 2002 until his resignation in early January 2005, Tillery was an employee of another WGI subsidiary known as Willbros USA, Inc. ("WUSA"), which conducted construction, engineering and facilities development operations in the United States and Canada. Although Tillery was an employee of WUSA as of 2002, he remained an officer of WII and his primary duties were in the international field, as reflected in his 2003 promotion to Executive Vice President of WII and later, to President of WII, with responsibility for global operations outside of North America. WGI listed Tillery as one of WGI's "executive officers" and "key personnel" in its annual filings with the Securities and Exchange Commission on Form 10-K for the fiscal years 1996 - 2003.

10. Co-conspirator Jason Edward Steph was a United States citizen and employee of WII. WII employed Steph from in or about 1998 to April 2005, when he resigned. Steph held the position of General Manager – Onshore in Nigeria from 2002 to April 2005, and reported directly to Tillery.

11. Co-conspirator Jim Bob Brown was a United States citizen and employed by WII from at least 1990 through April 2005. For the majority of his career with WII, Brown worked on international projects in Nigeria and South America. Specifically, Brown worked in Nigeria as a Cost Engineer (1990 – 1992), Administrative Manager (1992 – 1997), and Division Manager (1997 – August 2000). In August 2000, he was transferred to Venezuela as Managing Director of Constructor CAMSA, C.A., a WII subsidiary, where he worked until he was transferred back to Nigeria as Managing Director in or around November 2004. Brown reported directly to Tillery from approximately 1997 until the time of Tillery's resignation in early January 2005.

12. An unnamed co-conspirator, hereinafter referred to as Consultant 2, was a Nigerian national who performed purported consulting services for one or more of the Willbros Nigerian Subsidiaries in Nigeria. In and around 2004, Consultant 2 worked in coordination with NOVAK in offering and making corrupt payments to Nigerian officials on behalf of WGI, WII and their subsidiaries and affiliates. In 2005, Consultant 2 continued in that role. Consultant 2 was an agent of WGI and WII under the FCPA, 15 U.S.C. §§ 78dd-1(a) and 78dd-2(a).

13. A Canadian national, hereinafter referred to as "CN," was employed by WII and worked in Nigeria from 1993 to 1995, and again from at least 1998 through May 2005. Most recently, CN worked as Administrator and General Manager – Finance for WII. Among other duties, CN was responsible for requesting the payment, by wire transfer of funds from Houston, of WII's Nigeria-related expenses, including the payment of Company S and Company F invoices submitted by NOVAK. CN, at Tillery's direction, executed WWA's contract with Company F dated April 4, 2003. CN reported directly to Tillery from approximately 2002 until Tillery's resignation in early January 2005.

14. Three unnamed co-conspirators, hereinafter referred to as GCCB Employees 1, 2 and 3, were German nationals who worked for GCCB in Nigeria, and whose responsibilities included the EGGS project.

15. The intended recipients of the corrupt payments made by NOVAK and his co-conspirators were officials of the government of Nigeria, instrumentalities thereof, and those acting in an official capacity for and on their behalf. Specifically, the Nigerian officials included officials of NNPC, NAPIMS, the Political Party and a senior official in the executive branch of the Federal Government of Nigeria, as well as officials of SPDC. Each of these government officials was a "foreign official" as that term is

defined in the FCPA, 15 U.S.C. §§ 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). The Nigerian government officials and the Political Party are collectively referred to herein as the "Nigerian officials."

***Corrupt Payments by NOVAK and his Co-Conspirators***

EGGS Project Chronology

16. In anticipation of the EGGS Phase 1 bid, WII, WWA and GCCB formed a joint venture consortium (the "EGGS Consortium"). In December 2003, the EGGS Consortium submitted a commercial proposal to the Joint Venture, through the Joint Venture's operator, SPDC, for pipeline work on EGGS Phase 1 and, among other optional scopes of work, EGGS Coating and EGGS Phase 2. The EGGS Phase 1 contract price for "base scope" was approximately $216,500,000; the EGGS Coating optional scope price was approximately $30,000,000; and the EGGS Phase 2 price was approximately $141,000,000; for a combined total scope of work price of approximately $387,500,000.

17. After NNPC and NAPIMS approval, the Joint Venture awarded EGGS Phase 1 to the EGGS Consortium in and around May 2004. In July 2004, representatives of the EGGS Consortium and of SPDC (the latter, as operator of, and thus on behalf of, the Joint Venture) executed the EGGS Phase 1 contract, which included the EGGS Consortium's offer to perform

the optional scopes of work for EGGS Coating and EGGS Phase 2. In and around August 2004, again after NNPC and NAPIMS approval, the Joint Venture awarded the optional EGGS Coating work to the EGGS Consortium.

18. In late 2004 and early 2005, the EGGS Consortium continued its efforts to secure the EGGS Phase 2 optional scope of work, but ultimately was not successful in that endeavor.

EGGS Bribery Scheme: 2003 – 2004

19. In and around late 2003, NOVAK, Tillery, Steph, Consultant 2, certain GCCB Employees, and others agreed to make a series of corrupt payments totaling in excess of $6 million to, among others, officials of NNPC, NAPIMS, a senior official in the executive branch of the federal government of Nigeria, and to the Political Party, as well as to officials of SPDC, to assist in obtaining the EGGS project and its optional scopes of work. In order to secure the funds for these anticipated payments, NOVAK, Tillery, and others caused WWA to enter into purported "consultancy agreements" with Company S and, later, Company F, pursuant to which, in exchange for purportedly legitimate consultancy services, Company S and Company F invoiced WWA for 3% of the contract revenue received by

WWA for certain Nigerian construction and engineering projects, including the EGGS project.

20. The Company S and Company F invoices, which directed payment for credit to bank accounts in Lebanon, were initially delivered to WII's offices in Nigeria, then transmitted by commercial carrier from Nigeria to Willbros Group, Inc.'s ("WGI") administrative headquarters in Houston, Texas. Employees in Houston processed the invoices and paid them by wire transfer from a WII bank account located in Houston.

21. Tillery, Steph and others knew that NOVAK and Consultant 2 were engaged, on behalf of the EGGS Consortium, in corrupt negotiations with Nigerian officials who had influence over the EGGS business, and that NOVAK and Consultant 2 were using and intending to use some or all of the funds paid to Company S and Company F to make corrupt payments to those officials in order to cause those officials to award the EGGS contract and its optional scopes of work to WGI and WII. Tillery, Steph, and others authorized NOVAK and Consultant 2 to conduct these negotiations and make offers, payments and promises to pay money to the officials for the corrupt purposes described above.

22. The co-conspirators commonly referred to the promises to make corrupt payments as "commitments." By late 2004, more than $1,000,000 of

the corrupt payments had been paid to the Nigerian officials. However, "commitments" of millions of dollars more remained to be fulfilled through the receipt by the EGGS Consortium of EGGS contract revenue, the payment of 3% of that revenue to Company S and Company F (i.e., NOVAK and Consultant 2), and subsequent transfer of all or part of those funds to Nigerian officials.

23. On or about August 10, 2004, NOVAK, Tillery and CN caused to be delivered to WII in Nigeria, approved for payment and forwarded by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, two Company S invoices totaling $912,900.

24. On or about August 18, 2004, NOVAK, Tillery and CN caused to be delivered to WII in Nigeria, approved for payment and forwarded by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, a Company S invoice for $106,200.

25. On or about October 14, 2004, NOVAK and Tillery caused a wire transfer in the amount of $1,019,100 to be delivered from a WII bank account in Houston, Texas to a Company S bank account located in Lebanon, for the purpose of paying Company S invoice #s 4722-2506-009, 4777-1207-010 and 4652-2707-011, which were invoices related to corrupt payments made to the Political Party, a senior official in the executive

branch of the Nigerian federal government, and officials of NNPC and NAPIMS, in connection with the EGGS Phase 1 and EGGS Coating contracts.

26. On or about November 8, 2004, NOVAK, Tillery and CN caused to be delivered to WWA in Nigeria, approved for payment and forwarded by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, Company F invoice #2004-03P.01 for $870,623.

27. On or about December 20, 2004, NOVAK, Tillery and CN caused to be delivered to WWA in Nigeria, approved for payment and forwarded by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, Company F invoice # 2004-03P.02 for $785,949.

<u>Continuation of EGGS Scheme in 2005:  Alternative Funding Sources</u>

28. In January 2005, WGI announced Tillery's resignation from WGI and the commencement of an internal investigation by WGI's Audit Committee into allegations of tax improprieties relating to a WII Bolivian subsidiary operating under Tillery's management. The scope of the internal investigation quickly expanded to include alleged corrupt payments made in Nigeria. WII soon ceased paying Company F's invoices and terminated the

"consultancy agreements" between WWA and Company F and Company S. In Nigeria, Steph, Brown, and other WII employees learned of demands by the Nigerian officials for continued payment of the outstanding "commitments" related to the EGGS business. Steph, Brown, GCCB Employees 1 and 2, and others became concerned that failure to make the corrupt payments would result in interference with WII's business operations and potential loss of the EGGS Phase 2 contract (which had not yet been awarded), valued at approximately $141,000,000.

29.  In and around January and February 2005, Steph, Brown, Consultant 2, GCCB Employees 1 and 2, and others, agreed that Steph and Brown would raise money in Nigeria in order to pay some of the millions of dollars in outstanding "commitments" that NOVAK, Tillery, and Consultant 2 had previously made on behalf of WGI, WII, the Willbros Nigerian Subsidiaries, and the EGGS Consortium, regarding the EGGS project and other projects. Steph and Brown raised approximately 1,850,000 in cash and delivered that cash to Consultant 2 with the intent that Consultant 2 would deliver the funds to Nigerian officials.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: May 6, 2009

PAUL GRAYSON NOVAK
Defendant

ROBERT J. SUSSMAN, ESQ.
CHARLEY DAVIDSON, ESQ.
Attorneys for Defendant